## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 13 2020, 9:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Daniel G. Foote
Indianapolis, Indiana

Valerie K. Boots
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
INDIANA DEPARTMENT OF CHILD
SERVICES

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Monika Prekopa Talbot
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE CHILD
ADVOCATES, INC.

DeDe K. Connor
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship | July 13, 2020 |
| | Court of Appeals Case No. 20A-JT-178 |
| | Appeal from the Marion Superior Court |
| | The Honorable Mark A. Jones, Judge |

of J.H., Mother,[1] and Te.R.J., Ta.R.J., T.T.J., and T.H., Minor Children,

J.H.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner,*

and

Child Advocates, Inc.,

*Appellee-Guardian Ad Litem.*

The Honorable
Peter P. Haughan, Magistrate

Trial Court Cause Nos.
49D15-1901-JT-134
49D15-1901-JT-138
49D15-1901-JT-139
49D15-1901-JT-141

**Kirsch, Judge.**

[1] J.H. ("Mother") appeals the juvenile court's termination of her parental rights as to her four children. On appeal, Mother raises four issues, which we consolidate and restate as follows:

> I.  Whether the juvenile court committed clear error in determining there was a reasonable probability that the

---

[1] The juvenile court also terminated the parental rights of T.J., Sr. ("Father"), but he is not participating in this appeal. However, because Father was a party of record in the juvenile court, he is a party on appeal. *See* Ind. Appellate Rule 17(A).

conditions that led to the removal of her children would not be remedied; and

II.    Whether the trial court committed clear error in determining that termination of Mother's parental rights was in the best interests of her children.

[2]    We affirm.

# Facts and Procedural History

[3]    Mother has four children:  Te.R.J., born  September 27, 2007; Ta.R.J., born June 30, 2012; T.T.J., born December 11, 2014; and T.H., born July  28, 2016 (collectively, "Children"). *Appellant's App. Vol. II* at 51.  On March 11, 2017, the Indiana Department of Child Services ("DCS") removed Children from Mother's care on an emergency basis due to allegations of abuse and/or neglect. *Id*.  On March 14, 2017, DCS filed a petition alleging that Mother's Children were children in need of services ("CHINS") . *Id*. at 53, 69, 72, 76, 79.  The same day, the juvenile court issued an order that formally removed Children and placed them with DCS, citing:  (1) Mother's lack of stable housing and employment; (2) Mother's problems with substance abuse, mental illness, domestic violence; and (3) Mother's criminal behavior, which had included jail time. *Id*. at 53, 64.  On June 6, 2017, the juvenile court held a fact finding hearing and adjudicated Children to be CHINS based on Mother's admission that she "needs the assistance of DCS to address alternative conflict resolution within the home," and that the coercive intervention of the court was necessary. *Id*. at 53.  The juvenile court ordered Mother to participate in home-based case

management, submit to random drug screens, complete a domestic violence assessment, and participate in Children's therapy. *Id.*

[4] On March 8, 2017, the juvenile court held a permanency hearing, at which DCS recommended that the plan for permanency remain reunification. *Id.* at 55. On April 19, 2018, the juvenile court granted DCS's motion to suspend Mother's parenting time, noting that Mother had visited Children only once since the permanency hearing. *Id.* at 56. At a September 27, 2018 periodic review hearing, DCS reported that Mother was visiting Children but had been jailed twice and did not have stable housing or employment; however, Mother said she was willing to participate in services. *Id.* at 57. DCS was ordered to coordinate a psychological evaluation for Mother. *Id.* At a January 2, 2019 permanency hearing, DCS requested that the plan for Children be changed to adoption, and the juvenile court granted the request. *Id.* at 57-58. On January 25, 2019, DCS filed its petitions to terminate Mother's parental rights. *Id.* at 69-82.

[5] On July 15 and October 1, 2019, the juvenile court held final evidentiary hearings on DCS's petitions. *Tr. Vol. II* at 1-208. Family Case Manager ("FCM") Teirenney Fincher ("FCM Fincher") testified that she worked with Mother and Children for approximately one and a half years, ending in January 2019. *Id.* at 33. Children were initially placed with a paternal aunt, but eventually two of the children were placed with the maternal aunt because the paternal aunt was unable to provide for Children. *Id.* at 44. At one point, Mother went to the maternal aunt's residence, threatened her, and broke

windows in the apartment. *Id*. DCS then placed the two children who were with the maternal aunt into foster care, and the other two children were also eventually placed in foster care. *Id*. at 44-45. FCM Fincher referred Mother for drug screens, home-based casework, therapy, substance abuse assessment, and domestic violence services. *Id*. at 37. Mother missed several drug screens and did not complete a domestic violence assessment. *Id*. at 37-39.

[6] Mother would stay with various family and friends and was without stable housing during much of the time that FCM Fincher worked with Mother. *Id*. Mother often verbally and physically confronted those family and friends. *Id*. During one of Mother's visits with Children that FCM Fincher supervised, Mother charged FCM Fincher and challenged her to fight. *Id*. at 44. FCM Kathryn Mosby ("FCM Mosby") also testified that Mother had not shown the ability to provide Children with permanency. *Id*. at 133.

[7] FCM Fincher observed signs of mental illness with Mother. *Id*. at 43. Mother told FCM Fincher that she felt "things crawling on her skin" and that she felt like someone was following her. *Id*. Mother also made statements about someone "bio hacking" her. *Id*. Mother also told Home-Based Case Manager ("HBCM") Sylvester Carr ("HBCM Carr)" that she was "biometrically hacked," and she described DCS workers as "devils" or "some type of aliens," who never told her "what was going on" and that she would report the DCS workers to the FBI. *Id*. at 27, 72-73. FCM Tehya Jones ("FCM Jones") testified that she handled Mother's case from January to June of 2019 and that Mother told her that she often hallucinated; FCM Jones also testified that

Mother's statements exhibited paranoid thoughts. *Id.* at 113, 116. FCM Jones referred Mother to Choices Care for a psychological evaluation. *Id.* at 80, 115-16. Mother did not think there was anything wrong with her, but she eventually completed a psychological assessment and obtained a prescription. *Id.* at 75.

[8] HBCM and visitation facilitator Crystal Heard ("HBCM Heard") testified that she worked with Mother from November 2017 until April 2018 to help Mother obtain housing, employment, and achieve sobriety, but Mother did not achieve these goals. *Id.* at 63-64. Mother briefly obtained housing and employment, but she lost both. *Id.* at 63-64, 67. Mother did not consistently participate in visits, sometimes cancelling at the last minute and sometimes failing to respond when the provider called to confirm a visit. *Id.* at 66. When Mother did visit, she was always late and never took food for Children even though providers encouraged her to do so. *Id.* at. 51, 65-66. In April of 2018, the juvenile court suspended Mother's parenting time. *Id.* at 41-42.

[9] HBCM Carr testified that he worked with Mother from August to October 2018. *Id.* at 72. Mother's goals were employment, housing, and transportation, but she did not achieve those goals. *Id.* at 73. Mother refused to give HBCM Carr any information or sign any documents for housing. *Id.* Mother was provided a bus pass, but she did not use public transportation because she was afraid that people around her would attack her. *Id.* At one point, the services provided through HBCM Carr were interrupted because Mother was incarcerated. *Id.* at 74.

[10]   By June of 2019, Mother did not have any parenting time but still had home-based case management. *Id*. at 115. Mother's participation in services was sporadic. *Id*. at 120. FCM Jones believed that Mother would not comply with services even if given more time and concluded that Mother would not be able to provide stable housing for Children because she kept moving from one residence to another. *Id*. at 120-21. FCM Jones also said that Mother would not be able to provide financially for Children because she did not have a job. *Id*. at 121.

[11]   Choices Care Coordinator Arica Chatterley ("CCC Chatterley") testified that she became involved in Mother's case in January 2019. *Id*. at 87. CCC Chatterley made referrals for Mother for drug screens, individual therapy, and a psychological evaluation. *Id*. at 88. Mother communicated with CCC Chatterley inconsistently. *Id*. at 90. Mother demanded new referrals for services she had previously refused to complete, such as random drug screens, individual therapy, and a psychological evaluation. *Id*. at 91. DCS eventually approved the reopening of the referrals. *Id*.

[12]   Mother testified that since March of 2017, she had been arrested twelve times; Mother had also been convicted of theft and was incarcerated at the time of the termination hearings, although she was able to attend the second hearing. *Id*. at 185, 190, 193, 198-99; *DCS Ex.* 41. Mother admitted that she had stopping taking medication for her mental illnesses about a year earlier because she did not like how the medication made her feel. *Tr. Vol. II* at 200. Guardian Ad Litem Marybeth Browne ("GAL Browne") testified that Mother's behavior had

been erratic, hostile, and aggressive. *Id*. at 148. GAL Browne testified that Children were happier since they had been removed from the care of relatives because Children were engaged in activities and liked their placements. *Id*. at 149-50. GAL Browne recommended adoption for Children because this was in the best interest of Children. *Id*. at 154.

[13] On December 30, 2019, the juvenile court entered its order terminating Mother's parental rights in Children. *Appellant's App. Vol. II* at 51-68. The juvenile court concluded, in part:

> 46. o. The Court finds that DCS has shown by clear and convincing evidence that there is a reasonable probability that the conditions that resulted in the Children's placement outside the home of [Mother] will not be remedied.
>
> . . . .
>
> 47. e. The Court finds that DCS has shown by clear and convincing evidence that there is a reasonable probability that the continuation of the parent-child relationship between [Mother] and the Children poses a threat to the well-being of the Children.
>
> . . . .
>
> 48. i. The Court finds that DCS has shown by clear and convincing evidence that the termination of the parent-child relationship between [Mother] and the Children is in the best interests of the Children.

*Id*. at 65-66. Mother now appeals.

# Discussion and Decision

[14] Mother argues that the trial court committed clear error in concluding that the conditions that led to removal of the Children would not be remedied and that termination of Mother's parental rights was in the best interests of Children. As our Supreme Court has observed, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive -- so we review them with great deference to the trial courts[.]" *E.M. v. Ind. Dep't of Child Servs.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child and acknowledges that parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). The purpose of terminating parental rights is not to punish the parent but to protect the child. *In re D.P.*, 994 N.E.2d 1228, 1231 (Ind. Ct. App. 2013). Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id*. The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id*.

[15] When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* at 148-49. A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004).

[16] Where, as here, the juvenile court entered specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. Here, however, because Mother does not claim that the findings are unsupported by the evidence in the record, we need only determine whether the findings support the juvenile court's legal conclusions. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) (Unchallenged findings "must be accepted as correct."). If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[17] Before an involuntary termination of parental rights may occur, the State is required to allege and prove:

> (A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B)  that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)  that termination is in the best interests of the child; and

(D)  that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).  The State's burden of proof for establishing these allegations in termination cases is one of clear and convincing evidence.  *In re H.L.*, 915 N.E.2d at 149.  Moreover, if the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a).

# I. Remedying Reason for Removal of Children

[18]  In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would not be remedied, we engage in a two-step analysis.  *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013).  First, we determine what conditions led to the child's placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied.  *Id*.  We consider not only the initial reasons the child was removed but also any basis resulting in the continued placement outside of a parent's home.  *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013).  In the second step, the juvenile court must judge a parent's fitness at the time of the termination proceeding, considering evidence of changed conditions and balancing a parent's recent improvements against habitual patterns of conduct to determine if there is a substantial probability of future neglect or deprivation.  *E.M.*, 4 N.E.3d at 643.  The juvenile court has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination.  *Id*. at 642-43.  "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best

predictor of their future behavior." *Id*. at 643. Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *In re D.B.*, 942 N.E.2d 867, 873 (Ind. Ct. App. 2011). In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *E.M.*, 4 N.E.3d at 643.

[19]     When determining whether the conditions for the removal would be remedied, the juvenile court may consider the parent's response to the offers of help, including services offered by DCS and the parents' response to those services. *D.B.*, 942 N.E.2d at 873. Where there are only temporary improvements and the pattern of conduct shows no overall progress, the juvenile court might reasonably find that under the circumstances the problematic situation will not improve. *N.Q.*, 996 N.E.2d at 392. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. "Also, the failure to exercise the right to visit one's children demonstrates a lack

of commitment to complete the actions necessary to preserve [the] parent-child relationship." *Id.* (internal quotation omitted).

[20] Here, Mother argues that the trial court committed clear error in determining that the conditions that led to the removal of Children would not be remedied because the evidence showed that: 1) she has a bond with Children, who were happy to see her during visits, and she had age-appropriate conversations with Children; 2) she had "obtained gainful employment and housing at "various times"; 3) according to HBCM Heard, Mother sometimes showed good parenting skills; and 4) even though DCS was concerned about Mother's lack of sobriety, HBCM Heard testified that during the visits she supervised, Mother did not appear to be under the influence of any substances. *See Appellant's Br.* at 12-13.

[21] Mother's arguments ask us to reweigh the evidence, which our standard of review does not allow. *See H.L.*, 915 N.E.2d at 149. The reasons the trial court cited for removing the Children included: Mother's lack of stable housing and employment; Mother's problems with substance abuse, mental illness, domestic violence; and Mother's criminal behavior, which had included jail time. *Appellant's App. Vol. II* at 53, 64. There is no evidence Mother made any progress remedying these conditions. Mother did obtain employment and housing but only briefly. *Tr. Vol. II* at 63-64, 67, 73. She made no progress on her mental illnesses, evinced by her statements that: she felt "things crawling on her skin," she was "biometrically hacked," and DCS workers were "devils" or "some type of aliens." *Id.* at 27, 43, 72-73. Mother also hallucinated and

exhibited paranoid thoughts and behavior. *Id*. at 113, 116. Mother did complete a psychological assessment and was prescribed medication, but the record contains no evidence that her mental illnesses were alleviated, and to the extent that medication might have reduced her symptoms, Mother testified that she had not taken her medication for one year. *Id*. at 75, 200. The record also contains no evidence suggesting that Mother would remedy her criminal behavior. Since Children were removed, Mother was arrested twelve times, was convicted of theft, and was incarcerated at the time of the termination hearings. *Id*. at 185, 190, 193, 198-99; *DCS Ex*. 41.

[22] We also find that factors that were not the initial reasons Children were removed also support the trial court's conclusion that there was no reason to believe that Children should be returned to Mother. *See N.Q.*, 996 N.E.2d at 392. Mother was verbally and physical aggressive with family and friends who provided housing to her. *Tr. Vol. II* at 39. Mother's failure to cooperate with those providing services also supported the trial court's conclusion that Mother would not remedy the reasons for the removal of children. *See Lang*, 861 N.E.2d at 372. For instance, Mother missed drug screens, did not complete a domestic violence assessment, and cancelled visitation sessions with Children at the last minute. *Tr. Vol. II* at 39, 66. Accordingly, we conclude that Mother has failed to show that the trial court committed clear error in determining that

there was not a reasonable probability that the reasons for the removal of Children would be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).[2]

## II. Best Interests of Children

[23] Mother argues the trial court committed clear error in determining that terminating her parental rights was in the best interest of children, relying on the same facts she cited in her argument regarding whether the reasons for removal of Children would be remedied. Here again, Mother asks us to reweigh the evidence, which is not our prerogative under our standard of review. *See H.L.*, 915 N.E.2d at 149.

[24] In determining the best interests of a child, the juvenile court is required to look to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). The juvenile court must subordinate the interests of the parent to those of the children. *Id.* The juvenile court need not wait until the children are irreversibly harmed before terminating the parent-child relationship. *A.D.S.*, 987 N.E.2d at 1158-59. The inability of a parent to provide a stable environment for a child also supports a trial court's conclusion that termination of parental rights is in a child's best interests.

---

[2] Mother also contends that the trial court committed clear error in determining that the continued existence of the parent-child relationship poses a threat to the well-being of Children. Under Indiana Code section 31-35-2-4(b)(2)(B), DCS needed to prove only that there was a reasonable probability that the conditions that resulted in removal of Children would not be remedied *or* that that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being Children. Because we conclude that the evidence supports the juvenile court's conclusion that the conditions leading to removal of Children would not be remedied, we need not address this argument.

*K.T.K.*, 989 N.E.2d at 1230.  The recommendation by a DCS case manager and a guardian ad litem to terminate parental rights is sufficient to show by clear and convincing evidence that termination is in the child's best interests.  *A.D.S.*, 987 at 1158-59.

[25]    Here, FCM Jones did not believe that Mother would comply with services given more time and testified that Mother would not be able to provide stable housing for Children and that Mother could not provide financially for Children.  *Tr. Vol. II* at 120-21.  FCM  Mosby testified that Mother had not shown the ability to provide Children with permanency.  *Id*. at 133.  GAL Browne testified that Mother's behavior had been erratic, hostile, and aggressive and recommended that adoption was in the best interest of Children. *Id*. at 148-50.  Therefore, Mother has failed to demonstrate that the juvenile court committed clear error in determining that termination of her parental rights was in the best interest of Children.[3]

[26]    Affirmed.

Najam, J., and Brown, J., concur.

---

[3] Mother also argues that her marijuana use did not justify termination of her parental rights.  Because we do not rely on that fact in affirming the trial court, we need not address that issue.